J-S25039-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID V. GRIER | : | |
| | : | |
| Appellant | : | No. 1089 EDA 2022 |

Appeal from the Judgment of Sentence Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004315-2018

BEFORE:  NICHOLS, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                **FILED NOVEMBER 7, 2023**

David V. Grier (Appellant) appeals *pro se*[1] from the judgment of sentence imposed in the Philadelphia County Court of Common Pleas following his jury conviction of first-degree murder and possession of an instrument of crime[2] (PIC) for the November 2017 murder of Kierra Johnson.  On appeal, Appellant argues:  (1) the Commonwealth engaged in prosecutorial misconduct; (2) the jury's verdict was contrary to the sufficiency and weight of the evidence; and (3) he is in possession of after-discovered evidence warranting a remand for a new trial.  For the reasons below, we affirm.

---

[1] Appellant also represented himself at trial.

[2] *See* 18 Pa.C.S. §§ 2502(a), 907(a).

## I.    FACTS & PROCEDURAL HISTORY

The facts underlying Appellant's conviction, as presented during his jury

trial, are summarized by the trial court as follows:

On November 2, 2017, the decedent, Kierra Johnson, was last seen by her mother, Sherri Johnson, leaving her home to take the trolley to South Street in Philadelphia. The decedent borrowed Ms. Johnson's red backpack and told her that she was going to return something at a store on South Street and meet up with her friend, Sara Katz. Later that night, when the decedent did not return home and Ms. Johnson had not heard from her, she repeatedly texted and called the decedent's cell phone, but never received a response. Ms. Johnson also attempted to contact the decedent through Facebook, but she found that the decedent's Facebook profile had been deleted. Ms. Johnson then began Facebook messaging the decedent's friends to ask whether they had heard from the decedent that night, but no one had seen or heard from her. Ms. Johnson contacted Sara Katz, who told her that she did not see or hear from the decedent that night even though they had plans to meet. After the decedent failed to return home the next morning, Ms. Johnson called the police and filed a missing person report. Ms. Johnson informed the police that the decedent had been in a casual sexual relationship with [Appellant] and that the decedent had voiced concerns about her relationship with him.

Surveillance video from a store on South Street, Condom Kingdom, which the decedent entered on the night of November 2, 2017, showed the decedent wearing a black coat, black tights and red high-top sneakers while carrying a red backpack and a black plastic bag. The decedent is next seen on video entering SEPTA's Market-Frankford Line at 2nd Street and exiting at 69th Street Station at approximately 8:45 p.m. She then met up with [Appellant] and their images are captured on video walking on the 6700 block of Market Street at 8:49 p.m. Between 8:49 p.m. and 9:29 p.m., multiple surveillance videos show the decedent and [Appellant] together walking down Market Street before entering Cobbs Creek Park.

The next morning, at approximately 10:45 a.m., a man reported that he had seen a body in Cobbs Creek to Cobbs Creek Police Athletic League (PAL) Officer Darryl Johnson and brought

him to the location of the decedent's body.[3] The decedent's body was lying face down in Cobbs Creek next to a concrete platform underneath a bridge less than a quarter mile from the Cobbs Creek Recreation Center. When her body was discovered, she was in the same clothes she was seen wearing the night before, but her black thermal shirt was ripped and her cell phone, red backpack, and black plastic bag were missing.

The decedent was strangled to death with the straps of her own backpack and her body was left face down in Cobbs Creek. The decedent suffered abrasions to her face, neck, back, and hands. The decedent had bruising on her right thumb, the back of her left hand, the base of her left thumb, her knuckles, and her fingers. There were also abrasions on her face, including her left cheek as result of her face being pressed hard against another surface. She had scratches on her chin and marks on her neck consistent with attempts to remove the ligature from around her neck with her fingers. The ligature was not wrapped around the decedent's neck as there were no injuries to the back of her neck. Instead, there appeared to be two ligatures which went across the front of her neck, one on top of the other. The straps of the bag that the decedent had that night were consistent with the ligature marks on the decedent's neck. After killing the decedent, [Appellant] took her cell phone and turned it off before leaving the area with the decedent's cell phone, backpack, and plastic bag.

In the days following the discovery of the decedent's body, [Appellant] lied to the decedent's mother, the decedent's ex-girlfriend, Kayla Marshall, and three of his friends, Justice Taylor, Uriel Moody, and Santino McIlwaine, about being with the decedent that night. When Ms. Johnson and Kayla Marshall contacted [Appellant] the day after the murder and asked him whether he had seen the decedent, [Appellant] told each of them that he hadn't seen or spoken with her. [Appellant] also told

---

[3] The man told Officer Johnson that he was jogging when he noticed the body. *See* N.T., 2/2/22, at 137. Officer Johnson acknowledged that a person would not have been able to see the body of the decedent from the jogging path. *Id.* at 139. The officer also testified that although the jogger provided his name (which Officer Johnson could not recall), he did not have any identification, and was "adamant" about leaving before additional officers arrived. *See id.* at 140-43. Therefore, the jogger was never positively identified.

mutual friends, Justice Taylor, Uriel Moody, and Santino McIlwaine, that he hadn't seen the decedent for a week or two prior to her death. According to Marshall and Moody, the decedent and [Appellant] often hung out together, would take drugs together, and would smoke weed together in the area of Cobbs Creek Park where her body was found. When shown the surveillance video by the police, Marshall and McIlwaine identified the individuals walking down Market Street towards Cobbs Creek Park on November 2, 2017 as [Appellant] and the decedent.

Analysis of the decedent's cell phone corroborated the video evidence that the decedent walked down Market Street to Cobbs Creek Park and showed that, between 9:37 p.m. and 10:59 p.m., her phone was in the area where her body was later discovered. The decedent's phone was then powered off at 10:59 p.m. Furthermore, her call detail records showed that 1,319 of the 1,855 total text communications that she sent or received between September 1, 2017[,] and November 2, 2017 were to or from [Appellant].

On the night of the murder, [Appellant's] cell phone was either turned off or in airplane mode. There were no calls or texts sent or received by [Appellant's] cell phone and his phone did not generate any cell site location data. The lack of activity on [Appellant's] phone was unusual for [him] based on his past usage of his cell phone. [Appellant's] phone was turned back on at 5:31 p.m. on November 3, 2017.

Prior to his phone being searched by the police on November 18, 2017, [Appellant] deleted the decedent's contact and all communications with the decedent from his phone. [Appellant] also deleted all his phone calls made or received prior to November 3, 2017.[FN] However, a review of [Appellant's] cell phone records showed that, from August 1, 2017[,] through November 30, 2017, the most frequently called number on [Appellant's] phone was the decedent's phone number with an average of seven calls per day up until the night of the murder. After November 2, 2017, there were no calls from [Appellant] to the decedent even though she was not confirmed to be dead until November 5, 2017.

_____

FN A data extraction performed on [Appellant's] physical cell phone showed that the oldest phone call in his call log occurred on

- 4 -

November 3,2017 and the oldest text message on the device was from October 6, 2017.

On November 17, 2017, [Appellant] agreed to be transported to the Homicide Unit for questioning after Philadelphia Police Officer Kevin Day responded to a call about a disturbance [Appellant] was causing at the decedent's funeral. During his interview, Detective William Golphin noticed that [Appellant] had what he described as scars on both of his hands.

[Appellant's] DNA was found underneath the decedent's fingernails. The DNA found under the decedent's fingernails was a mixture of partial DNA profiles and both the decedent and [Appellant] were consistent with being a contributor to the DNA mixture.[FN]

[FN] According to . . . a forensic scientist in the Philadelphia Police Department's Office of Forensic Science, it was 14.05 quintillion times more likely that the DNA sample was a mixture of the decedent's and [Appellant's] DNA than a mixture of the decedent's and one random unrelated individual in the African American population.

Trial Ct. Op., 6/21/22, at 2-6 (record citations & some footnotes omitted).

Appellant was charged with murder, robbery,[4] and PIC. In April of 2018, Shaka Johnson, Esquire, was appointed to represent him. Attorney Johnson subsequently filed two motions to quash, which the trial court denied in August of 2018. As would become routine in these proceedings, Appellant filed his own *pro se* motion to quash while represented by counsel.

On September 17, 2018, three attorneys from Fellheimer & Eichen LLP — Alan Fellheimer, Esquire, Deborah Nixon, Esquire, and Kyle Garabedian,

---

[4] *See* 18 Pa.C.S. § 3701(a)(1)(i).

Esquire — entered their appearances as retained counsel for Appellant. Attorney Nixon took the lead, and on October 1, 2018, moved for a psychological evaluation of Appellant to determine his competency to stand trial, which the trial court granted the next day. Meanwhile, Appellant submitted several *pro se* filings to the trial court.

Thereafter, between November 1, 2018, and May 9, 2019, Appellant was involuntarily committed to Norristown State Hospital five times. On August 5, 2019, the trial court vacated the commitment order and directed that Appellant be transferred back to Philadelphia County prison.[5] *See* Order, 8/5/19. The trial court appointed Attorney Nixon to continue as counsel. *See* Order, 10/2/19.

Attorney Nixon filed several motions on Appellant's behalf related to the appointment of a digital forensic expert and forensic psychologist, the submission of recovered DNA profiles into the national DNA database, and the suppression of evidence and statements, while Appellant continued to file *pro se* motions. On January 15, 2020, Appellant was, once again, involuntarily committed. *See* Order, 1/15/20. On February 4 and March 11, and September 3, 2020, the court directed that Appellant undergo a mental health evaluation. During that period, Appellant filed numerous *pro se* motions,

---

[5] The court also directed Appellant to continue taking his medication, although neither the name of the medication nor Appellant's diagnosis, is included in the certified record. *See* Order, 8/5/19.

including a request to proceed *pro se*, which the trial court denied on October 29, 2020.

While Appellant continued to file *pro se* requests for relief, Attorney Nixon filed another motion challenging the affidavit of probable cause supporting Appellant's arrest warrant and search warrant, as well as additional motions reiterating her request for the appointment of a digital forensic expert, and suppression of certain evidence. The court disposed of the motions in several orders by denying all requests to dismiss the charges but granting the request for the appointment of a digital forensic expert. On April 8, 2021, the trial court also denied another *pro se* request to remove Appellant's attorney.

However, Appellant's desire to represent himself remained undeterred. At a status hearing on July 8, 2021, Attorney Nixon informed the court that Appellant again requested to proceed *pro se*. **See** N.T., 7/8/21, at 9, 19-20. The trial court conducted a **Grazier**[6] hearing, and colloquied Appellant regarding the ramifications of his decision. **See id.** at 22-39. The court also asked Attorney Nixon whether she had any information that would make Appellant "incompetent to represent himself[.]" **Id.** at 39. Attorney Nixon explained that while Appellant "absolutely has the intellectual acumen to" represent himself, she was concerned about his strategic decisions — *i.e.*, he did not want to present an alibi defense or testimony from expert witnesses —

_____

[6] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

and asked the court to order a mental health evaluation before rendering a final decision. *See id.* at 39-40. The court agreed to order an additional mental health evaluation, but stated: "[A]bsent something that jumps out at me, I'm going to let you represent yourself." *Id.* at 41. Attorney Nixon remained as standby counsel.

On August 27, 2021, Attorney Nixon was removed due to illness and Joseph Todd Schultz, Esquire, was appointed as standby counsel. Order, 8/27/21. Appellant continued to inundate the court with *pro se* filings, including a motion seeking juror forms, a recommendation concerning the order of witnesses at trial and modification of his bail. Appellant's jury trial commenced on January 31, 2022. On February 7th, the jury returned a verdict of guilty on the charges of first-degree murder and PIC, and not guilty on the charge of robbery.

The trial court conducted a sentencing hearing on February 15, 2022. Prior to the imposition of sentence, Appellant made an oral motion for judgment of acquittal, which the court indicated it had already previously denied.[7] *See* N.T., 2/15/22, at 8-9. Nonetheless, Appellant argued that the "charges and verdict [were] insufficient[,]" and that "the jury, obviously, disregarded the evidence." *Id.* at 9-10. He emphasized that: (1) the only evidence the Commonwealth had against him was that he was seen walking

---

[7] It is unclear when Appellant made this previous oral motion. Presumably, it was on February 7, 2022, the day the jury returned its verdict. The transcript for that date is not included in the certified record.

with the victim near where her body was recovered; (2) there was no evidence "of any negative connotation between the victim" and himself; (3) he repeatedly assisted authorities in the investigation, and (4) the discovery of his DNA could be "substantiated" by the fact that he was walking in close proximity to on the night in question. *Id.* at 9-10. The trial court repeated: "I have already denied that motion."[8] *Id.* at 10.

The trial court then proceeded to sentence Appellant to a mandatory term of life imprisonment for first-degree murder, and a concurrent sentence of six to 12 months' imprisonment for PIC. The court also colloquied Appellant to determine whether he wanted to continue to represent himself on appeal and determined that he did. *See* N.T., 2/15/22, at 43-48. That same day, Attorney Schultz filed a motion to withdraw as stand-by counsel, which the court granted on February 18, 2022. This timely *pro se* appeal followed.

On April 19, 2022, the trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal by May 11th. *See* Order, 4/19/22. Appellant filed an untimely request for an extension of time on May 19, 2022, which the trial court denied. The court then authored an opinion on June 21, 2022, suggesting that Appellant failed to preserve any issues for

---

[8] Later during the hearing, the trial court stated that it believed Appellant had preserved a weight of the evidence challenge for appeal. *See* N.T., 2/15/22, at 49. Despite the court's assurances, that same day, Appellant filed a written motion to preserve his sufficiency and weight challenges. *See* Appellant's Motion for Preservation of Oral Motion for Acquittal, 2/15/22, at i – iii.

appeal. *See* Trial Ct. Op., 6/21/22, at 6. Nevertheless, it addressed Appellant's sufficiency and weight claims. *Id.* at 6-10.

When the matter first appeared before this Court, we issued several *per curiam* orders directing the trial court to take further action pertaining to Appellant's *pro se* status,[9] his request for the release of documents necessary to the litigation of his appeal, and his request to file an amended Pa.R.A.P. 1925(b) statement. *See* Order, 6/21/22; Order, 8/2/22; Order, 10/24/22. Following remand, Appellant filed a Pa.R.A.P. 1925(b) statement on November 29, 2022. The trial court responded by filing a supplemental opinion on January 6, 2023. Since that time, Appellant has filed two additional motions in this Court seeking a remand to the trial court based upon "after discovered evidence." *See* Appellant's Application for Remand, 8/23/23; Appellant's Motion for Remand to the Trial Court Due to After Discovered Evidence, 9/18/23. In those filings, Appellant seeks to present purported new evidence regarding (1) the fact that the decedent's cell phone pinged at a tower after the presumed time of death, and (2) text messages confirming Appellant's cooperation with investigators on April 2, 2018. *See* Appellant's Application for Remand at 1 (unpaginated); Appellant's Motion for Remand to the Trial

_____

[9] There was no notification on the docket that a *Grazier* colloquy was conducted at the sentencing hearing. Thus, upon inquiry by this Court, the trial court entered an order on June 27, 2022, directing that the docket be corrected "to reflect that a *Grazier* Hearing was conducted . . . on February 15, 2022[, and Appellant] elected to proceed *pro se* . . . on appeal." Order, 6/27/22 (footnote omitted).

Court Due to After Discovered Evidence at 3-4. We will dispose of these applications in this decision.

## II.   __ISSUES ON APPEAL__

Appellant presents the following five issues for our review:

A.)   Did the [Commonwealth] engage in misconduct by knowingly presenting Special Agent William Shute's false testimony at trial and did this testimony in any reasonable way affect the verdict?

B.)   Does the defense have after-discovered evidence that would warrant Appellant's remand to the trial court for [a] new trial at it's (sic) most minimal dimension?

C.)   Did the trial court err in failing to grant the defense request of dismissal of the case due to an insufficiency of evidence claim?

D.)   Did the trial court err in failing to grant a new trial pursuant to the defense request of the verdict being against the weight of the evidence?

E.)   Did the trial court err in admitting the witness Uriel Moody's hearsay testimony into trial?

Appellant's Brief at 5.[10]

## III.   __WAIVER & PRO SE STATUS__

Preliminarily, we note that while Appellant preserved a challenge to alleged hearsay testimony by witness Uriel Moody in his Rule 1925(b) statement, he presents no argument concerning this claim in his appellate

---

[10] We have reordered Appellant's claims for purposes of disposition.

brief. Thus, his fifth issue is waived for our review. *See* Pa.R.A.P. 2119(a) (argument section of brief must include discussion and citation of pertinent authorities); *Commonwealth v. Hawkins*, 810 A.2d 668, 672 (Pa. Super. 2002) (declining to review issue when appellant failed to develop argument in any way).

We also emphasize that although we are willing to "construe liberally" the materials filed by Appellant, "a *pro se* appellant enjoys no special benefit." *Commonwealth v. Tchirkow*, 160 A.3d 798, 804 (Pa. Super. 2017). Moreover, when reviewing a *pro se* appellant's arguments,

> [t]his Court will not act as counsel and will not develop arguments on behalf of an appellant. [I]t is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. As such, [w]hen issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, a court will not consider the merits thereof. . . . [A]ny layperson choosing to represent [himself] in a legal proceeding must, to some reasonable extent, assume the risk that [his] lack of expertise and legal training will prove [his] undoing.

*Commonwealth v. Westlake*, 295 A.3d 1281, 1286 n.8 (Pa. Super. 2023) (citations & quotation marks omitted).

## IV. CELL SITE LOCATION EVIDENCE & TESTIMONY

Appellant's first and second issue both concern the Commonwealth's evidence regarding the cell site location analysis of the decedent's phone. In his first issue, Appellant contends the Commonwealth committed prosecutorial

misconduct when it allowed false testimony by Special Agent Shute "to go uncorrected." *See* Appellant's Brief at 14. According to Appellant, Special Agent Shute testified that his analysis of the decedent's cell phone location information indicated that her phone was in "cell-site sector 98309-2[,] or the band which cover[ed] . . . the area of the crime [scene,] from 9:37-10:59 pm" on the night of her murder. *Id.* (record citations & quotation marks omitted). He insists that Special Agent Shute testified falsely regarding the "time frame of 8:30 [p.m.] to about 11:00," when in actuality the Commonwealth's power point exhibit (Commonwealth Exhibit 105) showed the decedent's cell phone pinged in a different area, cell site sector 98309-1, at 11:53 p.m. *Id.* at 15 (record citation omitted); *see id.* at 17-18. Appellant deduces that this later ping demonstrates the decedent's phone was still active and "in movement" after 11:00 p.m., contradicting the agent's testimony, and, therefore, the Commonwealth had a duty to correct this false testimony. *Id.* at 15, 17.

Moreover, Appellant asserts this evidence was "powerful enough" for the jury to infer that the decedent traveled to a separate area after meeting with Appellant, where she was later murdered. Appellant's Brief at 15. He insists the 11:53 p.m. cell site ping "heavily" affects the decedent's time of death, and "eradicate[es] the relevancy of [his] relative proximity" to the area in which her body was recovered hours later. *Id.* *See also id.* at 19 (arguing the last cell phone ping proved the decedent was "freely moving about after Appellant's brief encounter with her"). Appellant also claims that the evidence contradicts the trial court's theory that the decedent's phone was "powered

off at 10:59 p.m.[,]" when Appellant took the phone after a "violent struggle" with the decedent at the scene. *Id.* at 22-23, *citing* Trial Ct. Op., 6/21/22, at 4, 8, 10. He maintains that the error was not harmless. *See* Appellant's Brief at 24.

In a related claim, Appellant contends the power point exhibit constitutes after discovered evidence that was not turned over to him before trial.[11] *See* Appellant's Brief at 52-53. He also maintains that the Commonwealth's failure to provide this exhibit represents a *Brady*[12] violation because it "could be used to infer the [decedent was] still . . . in movement" after 11:00 p.m. *Id.* at 55-56.

Appellant's argument invokes claims of prosecutorial misconduct, after-discovered evidence, and a *Brady* violation. It is well-settled that the Commonwealth "may not knowingly and deliberately misrepresent the evidence in order to gain a conviction." *Commonwealth v. Ali*, 10 A.3d 282, 294 (Pa. 2010) (citation omitted).

> Nevertheless, a claim of purposeful prosecutorial misrepresentation will not stand if examination of the record fails to reveal any indication of deceptive tactics on the part of the prosecution. Minor discrepancies in the Commonwealth's case will not be considered false evidence.

---

[11] Appellant also argues he is in possession of additional after-discovered evidence – not related to the cell site location data — which we will discuss *infra*.

[12] *Brady v. Maryland*, 373 U.S. 83 (1963).

- 14 -

*Id.* (citations omitted). Moreover, "[i]n order to preserve a claim of prosecutorial misconduct for appeal, a defendant must make an objection and move for a mistrial." *Commonwealth v. Sasse*, 921 A.2d 1229, 1238 (Pa. Super. 2007).

> To be granted a new trial based on after-discovered evidence, a defendant must demonstrate that the evidence could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence, is not merely corroborative or cumulative, will not be used solely to impeach the credibility of a witness, and would likely result in a different verdict if a new trial were granted.

*Commonwealth v. Brown*, 212 A.3d 1076, 1086 (Pa. Super. 2019) (citation omitted). Finally, we note that

> [t]o establish a *Brady* violation, an accused must prove three elements:
>
> > [1] the evidence [at issue] was favorable to the accused, either because it is exculpatory or because it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued.

*Commonwealth v. Chmiel*, 30 A.3d 1111, 1130 (Pa. 2011) (citations omitted).

Upon our review, we conclude Appellant misrepresents Commonwealth Exhibit 105 and Special Agent Shute's testimony concerning the cell site location data of the decedent's phone on the night of her murder. First, the relevant exhibit is a map tracking the decedent's movement on November 2, 2017, by marking which "cell sites and sectors" her phone pinged throughout

- 15 -

the evening. *See* Commonwealth's Exhibit 105 at 8.[13] Significantly, the text at the top of the exhibit states as follows:

> Approximate location of [the decedent's cell phone] on 11/02/2017 between 8:30PM and **midnight**. The phone utilized the following cell sites and sectors at the times indicated below.

*Id.* (emphasis added). As Appellant aptly points out, the map indicates where Appellant and the decedent were last seen on video at 9:26 p.m., and shows that the decedent's cell phone pinged on cell site cell site sectors 98309-1, 98309-2, and 98309-3 — which surround the Cobbs Creek Park location — between 8:40 and 11:53 p.m. *Id.* The pings for those three sectors are grouped in one box, so it is impossible to calculate the distance between cell site sector 98309-1 and sector 98309-2. This is the crux of Appellant's argument. He insists that because the decedent's cell phone pinged at sector 98309-2 at 10:59 p.m., and later pinged at sector 98309-1 at 11:53 p.m., the decedent was murdered in a different location and the culprit moved her body back to the crime scene at a later time. However, none of the evidence or testimony supports this theory.

Special Agent Shute testified that the sectors represented different antennas on the same cell phone tower. *See* N.T., 2/4/22, at 129. He explained: "[W]hen a phone is close to two different sectors on the same tower, you will often see it jump a little bit back and forth[,]" which was the

---

[13] Commonwealth Exhibit 105 is a power point presentation with 11 slides. Appellant's argument focuses solely on the slide at page 8.

case near the crime scene. *Id.* at 143-44. Accordingly, the fact that the decedent's cell phone may have pinged at sector 98309-1 at 11:53 p.m. does not corroborate Appellant's assertion that the murder occurred at a completely different location. Moreover, despite Appellant's attempt to pin down a specific time of death, Assistant Medical Examiner Dr. Khalil Wardak confirmed that he had no way to determine "an approximate time of death" in this case. *See* N.T., 2/4/22, at 42. *See also* is at 44-46 (agreeing that he could not determine when the decedent died, or if her body was moved at any time before or after her death).

Likewise, we conclude Special Agent Shute did not provide false testimony.[14] First, Special Agent Shute did **not** testify that the decedent's phone was powered off at 11:00 p.m.[15] Rather, he stated that there was "no location information" for her phone **after November 2, 2017**, which, necessarily, would include the ping at 11:53 p.m. *See* N.T., 2/4/23, at 157. Moreover, while his testimony focused on the location of the decedent's phone between 8:30 and 11:00 p.m., he specifically stated that he "ran the analysis

---

[14] The Commonwealth contends this claim is waived because Appellant failed to object to the alleged false testimony at trial. *See* Commonwealth's Brief at 7. While we agree Appellant did not object at that time, we decline to find waiver because Appellant also asserts that he did not discover this evidence until after trial, a claim that, as we discuss *infra*, is meritless.

[15] We recognize the trial court stated in its opinion that "[t]he decedent's phone was . . . powered off at 10:59 p.m." *See* Trial Ct. Op., 6/21/22, at 4. However, our review reveals no such testimony or evidence in the record. Rather, Special Agent Shute testified that there was no location data for the decedent's cell phone after November 2nd. *See* N.T., 2/4/23, at 157.

to midnight." ***Id.*** at 144. At no time did Special Agent Shute state the decedent's last cell phone ping was at 11:00 p.m. Thus, Appellant cannot demonstrate Special Agent Shute provided false testimony, and his prosecutorial misconduct claim fails.

Moreover, to the extent Appellant contends that the 11:53 p.m. cell phone ping constitutes after-discovered evidence, we disagree. Appellant was present when the exhibit was utilized by the Commonwealth at trial, and the exhibit explicitly indicates the decedent's cell phone location data was analyzed between 8:30 p.m. and midnight on November 2, 2018. ***See*** Commonwealth's Exhibit 105. Furthermore, the 11:53 cell phone ping at sector 98309-1 is clearly marked on the document. ***Id.*** Accordingly, this evidence is not newly discovered. ***See Brown***, 212 A.3d at 1086.

Nor can Appellant establish a ***Brady*** violation. First, he did not assert a ***Brady*** claim in either his Pa.R.A.P. 1925(b) statement or his statement of questions in his brief. Thus, it is waived. ***See*** Pa.R.A.P. 1925(b)(4)(viii) ("Issues not included in the Statement . . . are waived."); 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). Second, he did not object to the exhibit when it was presented by the Commonwealth at trial. ***See*** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Appellant maintains, however, that at the start of trial, he informed the court he was missing exhibits, and was not permitted to review the documents

before trial. *See* Appellant's Brief at 53. He insists that he presented the court with a "subpoena dated January 8th, 2022," in which he requested, *inter alia*, the cell phone location analysis data, but the trial court refused to consider this request before trial. *See id.* Our review of the notes of testimony from the first day of trial — January 31, 2022 — reveals no support for Appellant's present claim. While he did tell the court he did not have his "exhibits," it is unclear what exhibits he was referring to. *See* N.T., 1/31/22, at 9, 211. When Appellant further stated he did not have his "discovery," Attorney Schultz asked him if he was "talking about the information [he] provided [Attorney Schultz] in the brown folder[,]" to which Appellant responded, "Yes." *Id.* at 211-12. At that point, the trial court stated on the record: "Just so you know, I see [Appellant] holding up discovery. It says 'defense copy.'" *Id.* at 212. Shortly thereafter, the trial court indicated that it believed Appellant had "any and every piece of discovery" but directed Attorney Schultz to "discuss" it with him during the lunch recess. *See id.* at 213. When court reconvened, there was no further discussion on the record regarding any missing discovery. *See id.* at 216-24. Accordingly, Appellant's *Brady* claim fails.[16]

---

[16] Moreover, as we concluded *supra*, the exhibit in question did not contain information that was exculpatory to Appellant, nor did it impeach any of the Commonwealth's witness. *See Chmiel*, 30 A.3d at 1130. The relevant was merely a demonstrative compilation of the cell sector pings of the decedent's phone on the night of her murder. *See* Commonwealth Exhibit 105 at 8.

## V.   AFTER-DISCOVERED EVIDENCE – TEXT MESSAGES

Appellant presents a second after-discovered evidence claim related to his text messages with Attorney Johnson prior to his arrest.  He maintains these text messages prove that he voluntarily met with investigators a second time in April of 2018, when he provided them with his cell phone password.[17] Appellant's Brief at 56.  He claims that evidence contradicts the testimony of Detective Tolliver, who "averr[ed] ignorance to the meet[ing]." *Id.*  Appellant insists that his text messages provide "direct evidence of [him] being pro-active by solidifying his assistance and revealing a second meeting with authorities of which the jury would not be privy to." *Id.*  He acknowledges, that while "this evidence was in . . . stand-by counsel's theoretical possession[,] it was never in [his] possession" despite the fact that he submitted multiple subpoenas for the information.  *Id.* (emphasis omitted).

Again, we conclude his after-discovered evidence claim fails.  First, Appellant admits the evidence was in stand-by counsel's possession prior to trial.  *See Brown*, 212 A.3d 1086.  Second, even if he did not have access to his own text messages, Appellant intended to use this evidence "solely to impeach the credibility" of Detective Tolliver.  *See id.*  Third, to the extent Appellant contends evidence of his second meeting with investigators would have resulted in a different verdict, we disagree.  *See id.*  Appellant wanted

---

[17] Appellant first met with Philadelphia Police Detective Edward Tolliver in late 2017, following the decedent's memorial service, at which time Appellant requested to speak with his attorney.  *See* N.T., 2/2/22, at 15, 23-24.

to use this evidence to show he voluntarily provided his cell phone password to investigators, purportedly suggested he had nothing to hide. *See* Appellant's Brief at 56. However, Detective Tolliver admitted that although he did not recall speaking with Appellant a second time, "[o]ther detectives may have had contact with him" and it was possible they were provided with Appellant's cell phone password. *See* N.T., 2/2/22, at 25-26. Therefore, Appellant's after-discovered evidence claim warrants no relief.

## VI. SUFFICIENCY OF EVIDENCE

Next, Appellant argues the evidence was insufficient to support his convictions. *See* Appellant's Brief at 32. He maintains that the evidence "reveals the [decedent] to have died hours later, at an unknown location, for an unknown reason, and inescapably from an unknown person." *Id.* Appellant emphasizes the following: (1) the decedent's cell phone ping at a "separate area" after 11:00 p.m.; (2) the lack of physical evidence of a struggle, including "shuffled earth," at the crime scene; (3) the medical examiner's report "virtually barring the crime[']s occurrence in the water itself[;]"[18] (4) the "recent physical alteration of the crime scene by an

_____

[18] Dr. Wardak concluded that the decedent's cause of death was "ligature strangulation" and her manner of death was "homicide." *See* N.T., 2/4/22, at 19. Although her body was found "faced down in a body of water[,]" Dr. Wardak testified there was "no sign of drowning." *Id.* at 38. Appellant mistakenly believes this testimony supports his theory that the decedent was killed in a separate area and moved to crime scene afterwards.

unknown individual, potentially being the jogger[;]" (5) the lack of photographic documentation of the alleged scars of his hands; and (6) his cooperation with investigators. *Id.* at 32, 38-39, 41. He explains the presence of his DNA under the decedent's fingernails as "the by-product of [an] innocuous or secondary transfer from the [DNA] being left on an object[,]" and insists that there should have been no negative inference drawn from the fact that his cell phone was inactive on the night of the crime. *See id.* at 39, 43-44. Appellant asserts he was convicted simply because he was walking with the decedent earlier that evening, and he was not "forthcoming [about that fact] to the members of the public, to the point to lying to a select few[.]" *See id.* at 34, 45.

> Our review of a sufficiency challenge is well-established:
>
> Evidence legally is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to enable a reasonable fact-finder to find all of the elements of first-degree murder beyond a reasonable doubt. In conducting this inquiry, we must evaluate the entire trial record. In addition, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence.

*Commonwealth v. Clemons*, 200 A.3d 441, 462 (Pa. 2019) (citations & quotation marks omitted).

Although Appellant was convicted of both first-degree murder and PIC, he fails to present any argument regarding the PIC conviction in his brief.

Accordingly, any challenge to that conviction is waived for our review.[19] *See*

Pa.R.A.P. 2119(a); *Hawkins*, 810 A.2d at 672.

In order to secure a conviction of first-degree murder, the
Commonwealth must prove, beyond a reasonable doubt, that:

> (1) a human being was unlawfully killed; (2) the person accused
> is responsible for the killing; and (3) the accused acted with
> specific intent to kill. An intentional killing is a [k]illing by means
> of poison, or by lying in wait, or by any other kind of willful,
> deliberate and premeditated killing. . . .

*Clemons*, 200 A.3d at 462 (citations & quotation marks omitted). It is well-

settled that "[c]ircumstantial evidence can itself be sufficient to prove any

element or all of the elements of criminal homicide[,]" including the

identification of the defendant as the perpetrator. *See Commonwealth v.*

*Chamberlain*, 30 A.3d 381, 394 (Pa. 2011) (citations omitted).

_____

[19] Nevertheless, we note that a person commits PIC when he "possess any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a). An "instrument of crime" may be "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S. § 907(d)(2). As the trial court explained in its opinion:

> [Appellant] used the straps of the decedent's backpack to kill the
> decedent. The straps of the red backpack the decedent was seen
> carrying that night were consistent with the ligature marks on her
> neck. Based on the facts and circumstances established by the
> Commonwealth at trial, it was reasonable for the jury to conclude
> that [Appellant] used the red backpack straps to kill the decedent.

Trial Ct. Op., 6/21/22, at 9. We agree.

Concluding the evidence was sufficient to support the conviction of first-degree murder, the trial court opined:

> [Appellant] deliberately used the straps of the decedent's backpack to continuously apply pressure to her neck, which caused asphyxiation and resulted in her death, before he left her body face down partially in the water of Cobbs Creek. For [Appellant] to strangle the decedent to death, he must have applied substantial force to her throat to block her carotid artery for more than a minute. As [Appellant] strangled her, the decedent struggled and attempted to remove the backpack straps from around her neck. As a result, the decedent scratched herself and [Appellant], which left his DNA underneath her fingernails, finger marks around the ligature marks on her neck, and scratches on her chin and his hands. Despite these efforts, [Appellant] continued to choke her until she was dead.
>
> [Appellant] made every effort to cover up his involvement in the murder. He took the decedent's phone and turned it off before leaving the scene with her personal items. [Appellant] lied to the decedent's family and friends about having been with the decedent the night of her death. [Appellant] turned his cell phone off prior to the murder and deleted all his communications with the decedent on his phone. The fact that he did not attempt to contact the decedent a single time after finding out that she was missing further demonstrates [Appellant's] guilt. Viewing the evidence in a light most favorable to the Commonwealth, the evidence and all reasonable inferences drawn therefrom support [Appellant's] conviction for First-Degree Murder.

Trial Ct. Op., 6/21/22, at 7-8.

Our review of the record reveals the Commonwealth presented ample circumstantial evidence to support for the jury's verdict. Video surveillance footage showed Appellant and the decedent walking on the 6700 block of Market Street at 8:49 p.m. on November 2, 2017. *See* N.T., 2/2/22, at 211-13. Investigators were able to track their movement to the area of the Cobbs Creek Recreation Center, where they were both seen on video for the last time

- 24 -

at 9:26 p.m. *Id.* at 217-19, 229. Moreover, an analysis of the decedent's cell phone indicates it pinged at sectors in that area from 9:37 p.m. until 11:53 p.m. *See* N.T., 2/4/22, at 136; Commonwealth's Exhibit 105. After the final ping at 11:53 p.m., the decedent's phone was inactive. *See* N.T., 2/4/22, at 157.

Although Appellant was seen on surveillance video with the decedent before her death, he lied to the decedent's family and his friends about seeing her that night, he deleted all communications with the decedent on his phone, and he, uncharacteristically, either turned off his cell phone or turned it to airplane mode during the time of the murder. *See* N.T., 2/1/22, at 93-94, 273, 276; N.T., 2/2/22, at 46-48, 92; N.T., 2/3/22, at 42-43; N.T., 2/4/22, at 73, 137-39. Significantly, the assistant medical examiner determined that the decedent had injuries to her chin which were most likely from her attempt to remove the ligature around her neck — and a mixture of both her own and Appellant's DNA was recovered under her fingernails. *See* N.T., 2/3/22, at 123; N.T., 2/4/22, at 33. When Appellant met with investigators on November 17, 2017 — two weeks after the murder — a detective noticed scars on his hands, which were not evident during his arrest months later. *See* N.T., 2/2/22, at 180-83. Collectively, viewing the evidence in the light most favorable to the Commonwealth, there was more than sufficient evidence to support the jury's verdict.

Appellant's arguments to the contrary are based on his own theories, which are not supported by the evidence. As noted *supra*, the 11:53 p.m.

cell phone ping does not establish that the decedent was killed in a different area, particularly since the assistant medical examiner was unable to determine the time of death. Appellant was able to argue to the jury that his DNA could have been deposited underneath the decedent's fingernails from an innocuous transfer, but the jury was under no obligation to credit this theory. *See Clemons*, 200 A.3d at 462. As explained above, Appellant's conviction was not based solely on his presence near the crime scene, or his failure to be forthcoming with the decedent's family and his friends — rather, there was a myriad of circumstantial evidence pointing to him as the killer. Thus, we conclude Appellant's sufficiency claim warrants no relief.

## VII.  **WEIGHT OF EVIDENCE**

Appellant's final issue is a challenge to the weight of the evidence supporting the verdict.

Our review of a weight of the evidence claim is well-established:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. When a trial court considers a motion for a new trial based upon a weight of the evidence claim, the trial court may award relief only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.
>
> The inquiry is not the same for an appellate court. Rather, when an appellate court reviews a weight claim, the court is reviewing the exercise of discretion by the trial court, not the

underlying question of whether the verdict was against the weight of the evidence. The appellate court reviews a weight claim using an abuse of discretion standard.

*Commonwealth v. Jacoby*, 170 A.3d 1065, 1080 (Pa. 2017) (citations & quotation marks omitted; paragraph break added).

Because our review of a weight claim is limited to whether the trial court abused its discretion in denying the claim below, a challenge to the weight of the evidence must be preserved either: "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A)(1)-(3). As discussed above, when Appellant raised his weight of the evidence claim at the sentencing hearing, the trial court assured him that he had already preserved that claim. *See* N.T., 2/15/22, at 8-10. Nevertheless, Appellant filed a written motion seeking to preserve his sufficiency and weight claims on that same day. Therefore, we conclude Appellant has sufficiently preserved this issue for our review.

Appellant's weight claim focuses on the "unnamed jogger," whom he contends "exhibited objectively suspicious behavior" by lying about how he discovered the decedent's body and refusing to provide any identification. *See* Appellant's Brief at 48. He insists a "recently damp article of clothing" recovered from the crime scene could only have been placed there by the jogger, and that the jogger could be a match for the unidentified DNA

recovered at the crime scene.[20] *See id.* at 48-49, 51. Appellant also asserts that there was no evidence establishing that he turned off his cell phone voluntarily on the night of the crime. *See id.* at 50.

The trial court disposed of Appellant's weight claim as follows:

> The jury's verdict is not so contrary to the evidence as to shock one's sense of justice. Quite the opposite, in fact, as the evidence of [Appellant's] guilt was overwhelming. As discussed above, the evidence established that [Appellant] took the decedent's backpack and used it to strangle her to death. [Appellant] attempted to conceal his connections to the decedent's murder by making sure his phone was powered off when he murdered the decedent, turning off the decedent's phone after he murdered her, taking the murder weapon with him when he left, deleting all communications with the decedent on his phone, and lying to others about being with the decedent that night. Accordingly, [Appellant's] claim that his conviction is against the weight of the evidence fails.

Trial Ct. Op., 6/21/22, at 10.

Other than simply highlighting a potential additional suspect, Appellant fails to explain how the trial court abused its discretion in denying his weight of the evidence claim. *See Jacoby*, 170 A.3d at 1080. The jury was well aware that an unidentified jogger discovered the decedent's body in an area which was not visible from the jogging path. They were also informed that the jogger was "adamant" about leaving the scene before additional officers

---

[20] There were numerous items found near the crime scene that were submitted for DNA testing — including a used condom, a piece of material from the decedent's shirt, the cord from the decedent's headphones, a lighter, and beer cans — which either yielded no DNA, or produced results that were either inconclusive or excluded Appellant as a contributor. *See* N.T., 2/3/23, at 115-16, 121-22, 125-26, 128-29, 133-35.

arrived. **See** N.T., 2/2/22, at 141-43. Although there was unidentified male DNA recovered at the scene, the **only** DNA recovered from **underneath the decedent's fingernails** was a mixture of her own DNA and Appellant's DNA. **See** N.T., 2/3/22, at 123. Appellant was the last person seen with the decedent when she was alive, her body was recovered near the area where they were last seen, Appellant's cell phone was unresponsive the evening of the murder, and Appellant deleted all his communications with the decedent from his cell phone. We conclude the trial court did not abuse its discretion in denying Appellant's weight of the evidence challenge.

## VIII. <u>APPLICATIONS FOR REMAND</u>

Subsequent to the filing of this appeal, on August 17 and September 18, 2023, Appellant filed two applications seeking a remand to the trial court so that he can raise his after-discovered evidence claims regarding the 11:53 ping of the decedent's cell phone and his text messages supporting his claim that he met with investigators a second time. **See** Appellant's Application for Remand at 1 (unpaginated); Appellant's Motion for Remand to the Trial Court Due to After Discovered Evidence at 3-4. Because we have addressed, and denied, of both of these claims in this decision, we deny Appellant's post-appeal applications for relief as moot.

## IX.  CONCLUSION

Upon our review, we conclude that none of the claims raised by Appellant on direct appeal warrant relief.  Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.  Appellant's Application for Remand & Appellant's Motion for Remand to the Trial Court Due to After Discovered Evidence denied as moot.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/7/2023